Wesley T. BAILEY, Plaintiff-Appellee,

v.

CHATTEM, INC., Defendant-Appellant.

No. 80–5439.

United States Court of Appeals,
Sixth Circuit.

Argued April 19, 1982.

Decided Aug. 3, 1982.

Rehearing Denied Sept. 17, 1982.

W. Neil Thomas, III, Thomas, Mann & Gossett, W. Neil Thomas, Jr., Chattanooga, Tenn., for defendant-appellant; George T. Mobille, Cushman, Darby & Cushman, Washington, D. C., on brief.

Carlos C. Smith, David B. Kesler, Strang, Fletcher, Carriger, Walker, Hodge & Smith, Chattanooga, Tenn., Truman R. Adkins, Redondo Beach, Cal., Gary Lande, Poms, Smith, Lande & Rose, Los Angeles, Cal., for plaintiff-appellee.

Before ENGEL and KENNEDY, Circuit Judges, and ENSLEN,* District Judge.

CORNELIA G. KENNEDY, Circuit Judge.

In this case we are called upon to decide whether plaintiff's patent is invalid, thus defeating his causes of action based on the assignment of rights in the patent; whether California or Tennessee law properly applies on the facts of this case to plaintiff's claim of promissory fraud; whether the damages the jury awarded plaintiff, as reduced by the trial court, were excessive as a matter of law; and whether there was sufficient evidence to submit plaintiff's cause of action for failure to commercialize to the jury. We affirm the judgment of the District Court as to liability but remand for a new trial as to the amount of damages for the promissory fraud claim.

Liquid substances such as paint, which are frequently applied to a vertical surface with a high speed applicator such as a spray gun, have historically presented users with something of a dilemma. If the substance has a low enough viscosity for satisfactory high speed application it tends to drip and sag once on the vertical surface. If, on the

---

* The Honorable Richard A. Enslen. United States District Court for the Western District of Michigan, sitting by designation.

other hand, the substance is thick enough that it will not drip or sag once applied, it is too thick for use in a high speed applicator.

During the 1960s appellee Wesley T. Bailey worked with alkyd resins (paint) to improve their properties during application. Specifically, he was exposed to the idea of premixing aluminum alkoxide in paint thinner, then adding this premix to the alkyd resins to produce a paint that maintained a low viscosity during application but had a high viscosity once applied to a vertical surface. The paint was, therefore, easy to spray but resisted dripping and sagging as well. A fluid with these characteristics is "thixotropic" or "non-Newtonian."

Unsaturated polyester resins, used in conjunction with fiberglass to form fiberglass products, present the same problem to users as did alkyd resins. Although there were ways to solve the "poor application or poor result" dilemma for polyester resins in the early 1970s, they were expensive and had undesirable side effects. In early 1970 Bailey conceived of adding aluminum alkoxides to polyester resins to render them thixotropic without the unwanted side effects. In April, 1970 Bailey recorded his idea in an invention disclosure record, witnessed by his son and wife. He did not, however, reduce his idea to practice then.

Bailey's idea apparently lay dormant for four years. In 1974 Bailey, who is a consultant in the chemical and petrochemical fields doing business as Wesley T. Bailey & Associates in Redondo Beach, California, came into contact with defendant-appellant Chattem, Inc., a Tennessee corporation that produced aluminum alkoxides and other products. Chattem was seeking new uses for its products and entered into discussions with Bailey to further this goal. The discussions culminated with Bailey and Chattem entering into an agreement effective October 1, 1974 whereby Bailey would serve as a consultant to Chattem. The agreement provided that any discovery or invention involving Chattem's operations made by Bailey during or as a direct result of his consultation would be the exclusive property of Chattem.

Bailey began work immediately to reduce his idea to practice. Soon after he began consulting for Chattem he premixed aluminum alkoxide in styrene, then added the premix to polyester resin. Styrene is the solvent for unsaturated polyester resins the way paint thinner is the solvent for paint. With some further refining the styrene premix added to the polyester resin produced the desired non-Newtonian properties.

The next steps were to produce a commercially feasible product and to procure a patent. At the same time Bailey and Chattem entered into discussions concerning both the assignment of Bailey's rights in the patent and, in the interim, renewal of the original consulting agreement. The parties agreed to extend the consulting agreement for a series of two-year terms, renewable automatically every two years but cancellable on 90 days' notice by either party. In exchange for his rights in the invention Bailey was promised a one percent royalty on any sales of products made under the patent. Bailey alleged that he was also promised a consulting agreement for the life of the patent which would be cancellable on 90 days' notice on his part but would not be cancellable by Chattem, and would replace the renewable two-year consulting agreement. Bailey assigned his rights in his invention to Chattem before the patent issued. He and Chattem subsequently, but still before the patent issued, signed a renewable two-year consulting agreement.

After several applications and two rejections the Patent Office approved U. S. Patent No. 4,049,748 covering Bailey's invention on September 20, 1977. Meanwhile, Chattem and Bailey were encountering technical difficulties in producing a marketable product. The difficulties persisted until shortly before trial of the case in 1980 according to Bailey, and even at the time of trial according to Chattem. After the patent issued Bailey inquired about the promised long-term consulting agreement, but was told that he had received all he was entitled to in the one percent royalty and renewable two-year consulting agreement.

When Chattem persisted in its refusal to enter into a consulting agreement for the life of the patent Bailey filed this lawsuit.

By stipulation of the parties the case was tried to a jury before a United States magistrate. Bailey argued that Chattem had breached a contract to give him a long-term consulting agreement in exchange for his rights in the patent. In the alternative he argued that Chattem was guilty of promissory fraud, in that when it made the promise to enter into a long-term consulting agreement it had no intent to perform. Bailey also sought to recover for Chattem's failure to commercialize the potential product and bring the premix to market earlier than it did. Chattem defended, *inter alia*, on the ground that Patent No. 4,049,748 was invalid, having been procured through a fraud on the Patent Office. Chattem also claimed that because Bailey did not perfect the invention until after he began working for Chattem, the invention was the property of Chattem under the terms of the consulting agreement. For both of these reasons Chattem contended there was a want of consideration for any promise it might have made to Bailey.

The jury rejected Chattem's defenses. It found the patent valid and found the invention complete prior to October 1, 1974. The jury also rejected Bailey's contract claim, but found in his favor on both the promissory fraud and failure to commercialize claims. It awarded damages totalling $650,000, including $548,000 compensatory and $75,000 punitive for the fraud and $27,000 for the failure to commercialize. The trial court denied Chattem's motion for a judgment NOV or new trial, conditioned on Bailey's accepting a remittitur of $148,000 of the compensatory damages for fraud. Bailey accepted and this appeal followed.

## VALIDITY OF THE PATENT/OWNERSHIP OF THE INVENTION

Chattem maintains that Bailey's testimony in support of his ownership of the invention is inconsistent with his disclosures to the Patent Office. It urges that because of the inconsistency we must either find that Bailey did not own the invention, or rule that the patent is invalid *ab initio*.

To prevail at trial Bailey had to persuade the jury that adding aluminum alkoxide in a styrene premix to polyester resins to give the resins non-Newtonian properties was "invented" by him (as the word "invention" was used in the original consulting agreement) prior to the start of his consulting for Chattem on October 1, 1974. If the "invention" did not take place until after the start of consultation then by the terms of the consulting agreement it belonged to Chattem. To prove that the invention preceded October 1, 1974 and was his, Bailey introduced his invention disclosure record. The record contained an entry dated April 16, 1970 which described the addition of aluminum alkoxide to polyester resins to achieve a non-Newtonian fluid. However, the invention disclosure record did not describe the use of a styrene premix to introduce the aluminum alkoxide to the resin. For most aluminum alkoxide compounds such a premix is apparently necessary to produce a non-Newtonian fluid and to avoid a mixture with the undesirable consistency of applesauce.

Chattem argued at trial that Bailey's invention was not complete until he actually reduced the idea to practice by adding aluminum alkoxide to the resin in a styrene premix, and that he did not do this until after he began consulting for Chattem. Chattem supported its argument in part with the claim that Bailey had not even thought of the admittedly critical premix step prior to working for Chattem, as if he had he would surely have included this step in his description of the invention either in the invention disclosure record or in some other writing. Bailey responded that although he had not described the premix step in writing prior to his consulting with Chattem, he never contemplated adding the aluminum alkoxide without a premix because all of his prior work with alkyd resins indicated that a premix was necessary. Bailey successfully persuaded the jury on this point, and also on the ultimate point that his invention was complete within the

meaning of the consulting agreement at the time he thought of all the major necessary steps, not when he reduced it to practice. The jury, therefore, found that Bailey, not Chattem, owned the invention.

In connection with his patent application Bailey made at least a partial disclosure of the prior art wherein aluminum alkoxide was added to alkyd resins in a paint thinner premix. He distinguished the addition of aluminum alkoxide to alkyd and polyester resins, but he may not have disclosed the use of a premix with alkyd resins. He also disclosed prior art wherein aluminum alkoxide was added to polyester resins. Bailey distinguished this latter prior art on the ground that it did not show the use of a premix, so produced a polyester resin without thixotropic properties. Bailey contended to the Patent Office that his invention was adding aluminum alkoxide to the polyester resin in a premix instead of directly. It is Chattem's position that in making these claims Bailey relied on the inventiveness of using a premix but never disclosed to the Patent Office that, as he successfully argued to the jury to establish his rights in the invention, he considered a premix step obvious from his work with alkyd resins.

Chattem contends here that Bailey cannot have it both ways. If the essence of his invention is the premix and the use of a premix with polyester resins is not obvious as he argued to the Patent Office, then the jury could not have found that the use of a premix was obvious to him prior to October 1, 1974. As a result, his invention was not complete until Bailey first actually used a premix, which was after he began work for Chattem. If, on the other hand, the need for a premix step was so obvious from Bailey's work with alkyd resins that he did not need to write it down in order to claim he thought of it before working for Chattem, then the use of a premix fails to draw a patentable distinction between Bailey's invention and the prior art and Bailey had an obligation to disclose this fact to the

Patent Office. A patent applicant owes an "uncompromising duty" to disclose material prior art to the Patent Office, *Buzzelli v. Minnesota Mining & Manufacturing Co.*, 521 F.2d 1162, 1165 (6th Cir. 1975), and "he risks non-enforcement of his monopoly on later discovery of a failure to fulfill that obligation." *True Temper Corp. v. CF&I Steel Corp.*, 601 F.2d 495, 501 (6th Cir. 1979). Had Chattem demonstrated that Bailey breached that uncompromising duty here we would be required to find the patent invalid.

However, Chattem has not preserved this question for our review. As stated in Chattem's motion for directed verdict, its claim at trial that the patent was invalid because of material misrepresentation on Bailey's part to the Patent Office had two facets: first, the patent was invalid because in Figure 2 of the patent application Bailey allegedly misrepresented to the Patent Office the retained flexural strength of certain cured polyester resins after sustained exposure to boiling water; second, it was invalid because Bailey made a material misrepresentation when he told the Patent Office that a premix was *always* necessary to add aluminum alkoxide to polyester resins to get a thixotropic liquid, although his roughly contemporaneous thoughts were that for some classes of aluminum alkoxide a premix was not necessary. Bailey fully explained both these alleged misrepresentations at trial. The magistrate and jury each rejected Chattem's theories and Chattem did not appeal those decisions. Most important for our present purpose, the two facets of material misrepresentation Chattem relied on at trial have nothing to do with the argument presented here, that failure to disclose prior use of a premix with alkyd resins was a material omission. Nowhere in the record on appeal can we find that Chattem asked the trial court to rule, as a matter of fact or law, that Bailey's patent was invalid for the reasons Chattem puts forth here.[1]

---

1. During cross-examination of Bailey counsel for Chattem did inquire whether Bailey had informed the Patent Office of his work with alkyd resins, or tell the Patent Office that he thought his invention was obvious. This bit of testimony, never raised to the trial court as

■ "It is this Court's inveterate rule not to reverse on grounds not raised in the district court." *United States v. McDowell Contractors, Inc.*, 668 F.2d 256, 257 (6th Cir. 1982). *See also Union Planters National Bank v. Commercial Credit Business Loans*, 651 F.2d 1174, 1187 (6th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 972, 71 L.Ed.2d 111 (1982). The rule is applicable where fraud on the Patent Office is alleged. *LaSalle Street Press, Inc. v. McCormick & Henderson, Inc.*, 445 F.2d 84, 96 (7th Cir. 1971). Chattem asks us to create an exception to this rule here in recognition of the strong public policy against enforcement of fraudulently acquired patents. It cites *Lear v. Adkins*, 395 U.S. 653, 670–671, 89 S.Ct. 1902, 1911, 23 L.Ed.2d 610 (1969), for the proposition that "technical" legal doctrines should not bar judicial review of a patent's validity.

■ *Lear v. Adkins* involved a question much different than that presented here. The Supreme Court there ruled that a patent licensee could sue the licensor and claim the patent was invalid, despite a contract doctrine of estoppel that would have barred the suit. The Court was concerned that no party other than the patent licensee would have the resources or inclination to vindicate the strong public interest in free and fair competition. No similar concern exists here. Requiring the parties to raise all issues in the trial court on penalty of not being able to present them on appeal does not foreclose anyone from litigating the validity of a patent. Nor is the requirement that all issues be raised in the first instance in the trial court a "technical" rule of law. It is the means by which we ensure that the issues have been thoroughly litigated and that review is based on a complete record.[2]

Although we do not hold that no fraud on the Patent Office could ever be raised for the first time on appeal, the facts of this case do not warrant a departure from the well-settled rule. We note that if Chattem was surprised by Bailey's testimony at trial as it claims, it should not have been. Chattem had ample warning as to the substance of Bailey's testimony and could have raised this issue below.

■ Whether or not Bailey had an obligation to tell the Patent Office that he thought his use of a premix with polyester resins was obvious, we have no difficulty affirming the jury's conclusion that Bailey owned the invention. The jury could find from the evidence that the word "invention," as used by the parties to the consulting agreement, did not require reduction to practice. There was also more than sufficient evidence from which the jury could find that although the premix step was not encapsulated in writing, Bailey's idea was complete prior to the time he began to work for Chattem. In addition to Bailey's testimony on this point, it appears from the evidence that in September 1974 he discussed the use of a styrene premix with one of Chattem's officers.

part of Chattem's theory for recovery, is not sufficient to preserve the question of law on appeal.

2. The wisdom of this rule is demonstrated here. Even under Chattem's characterization the jury would not have been required on the present record to find inconsistent Bailey's positions in claiming the invention while distinguishing prior art. It is possible that in context Bailey's claim that the use of a premix was obvious from his work with alkyd resins extended no farther than a statement that in order to achieve thixotropic properties in a fluid it was obvious to him that a premix was the necessary means of putting the additive in the fluid. In arguing this position to the jury Bailey did not need to state that it was obvious to him to premix this particular additive, aluminum alkoxide, in this particular solvent, styrene, to make thixotropic this particular fluid, polyester resin. At the same time, in his presentation to the Patent Office Bailey could have been claiming only the inventiveness of this particular premix. He was not necessarily claiming the inventiveness of the premix step per se, nor did he need to, to distinguish his work from prior art involving the addition of aluminum alkoxide to polyester resins in another fashion to achieve a different purpose. However, because this issue was not raised below the jury was never asked to decide the alleged inconsistency in Bailey's position at two different times on this or any other basis.

### PROMISSORY FRAUD

■ Having determined that Bailey owned his invention and that the magistrate did not err in finding Patent No. 4,049,743 valid and enforceable, we must next decide whether the jury properly could find that Chattem committed the tort of promissory fraud, and if so, whether the jury's award of damages was excessive. Chattem argues that Tennessee law applies to these questions, and that Tennessee does not recognize the tort of promissory fraud. Bailey contends that California law applies, but that even if Tennessee law applies Tennessee in an appropriate case will recognize such a tort, and this is an appropriate case. Since we conclude that California law applies it is unnecessary for use to resolve the argument regarding the law of Tennessee.

Bailey is a resident of California, doing business in California as Wesley T. Bailey & Associates. He performed a substantial part of his consulting work for Chattem in California. Chattem is a Tennessee corporation with its principal place of business in Tennessee. Many of the discussions between Bailey and Chattem concerning assignment of his rights in any patent that issued saw a representative of Chattem speaking or writing in Tennessee to Bailey, who received these communications in California. Bailey twice executed an assignment of his right to the patent in California and mailed these assignments to Chattem in Tennessee.

■ Tennessee is the forum state in this case. The conflicts law of the forum determines which state's substantive law shall apply. *Telecommunications, Engineering Sales & Service Co. v. Southern Telephone Supply Co.*, 518 F.2d 392, 394 (6th Cir. 1975). Where a tort is alleged Tennessee conflicts law applies the substantive law of the state where the wrong occurred. *Winters v. Maxey*, 481 S.W.2d 755 (Tenn.1972). If the tort occurred in more than one state the place of the wrong is the state where the last event necessary to make the actor liable took place. *Koehler v. Cummings*, 380 F.Supp. 1294, 1305 (M.D. Tenn.1974). Under this *lex loci delicti* approach, "[w]hen a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made." Restatement of Conflict of Laws § 377, Note 4 (1934).

Chattem argues on appeal that the trial court should have applied the substantive law of Tennessee, on the theory that Bailey was not damaged and the tort was not complete until he was refused the long-term consulting contract that Chattem supposedly promised him and this refusal occurred in Tennessee. In the alternative, Chattem argues that because Bailey enclosed certain conditions with the first assignment of his patent rights the delivery was not effective in California, so Tennessee law should apply.

Chattem cannot prevail on its theory that Bailey did not effectively assign his patent rights in California. The record shows that Bailey executed two assignments. The first, absolute on its face, was accompanied by a letter requesting Chattem not to record the assignment until the completion and signing of the promised long-term consulting agreement. Chattem's argument is that the letter accompanying the first assignment evidenced Bailey's lack of intent to assign the patent at the time, and thus delivery of the assignment was not complete in California.[3]

■ We think Bailey's first assignment of his patent rights was effective and so constituted detrimental reliance. The law in this Circuit is that recording does not affect the validity of a patent assignment except as to subsequent purchasers or mortgagees without notice. *Why Corp. v. Super Ironer Corp.*, 128 F.2d 539, 541 (6th Cir.

---

**3.** Bailey and Chattem do not share a common interpretation of the phrase "long-term consulting agreement." Bailey contended it meant a 17 year, life of the patent, contract. Chattem, on the other hand, contended it meant the two-year automatically renewable contract, subject to cancellation, which Bailey actually received. Consistent with its interpretation, Chattem recorded the assignment when Bailey signed the first two-year agreement, before the patent issued.

1942). Therefore, Bailey's request that Chattem not record the assignment did not affect rights between the parties.

However, were this not the law our decision would be the same. Chattem's argument goes to when Bailey was harmed, not where. From the record on appeal we can only conclude that whenever he eventually assigned his rights in the patent, the place Bailey did so was California. If Bailey's first assignment was ineffective, it was nonetheless followed by a second, unconditional assignment.[4] *Cf.* Restatement of Conflict of Laws § 477, Note 4, Illustration 5. Chattem has produced no evidence that Bailey assigned his rights outside California.

■■■■ Nor are we persuaded that Bailey did not sustain harm until Chattem failed to perform. Under California law promissory fraud is the implied misrepresentation of a *present* fact, the promissor's present intent to perform the promise. *See, e.g., Harazim v. Lynam*, 267 Cal.App.2d 127, 72 Cal.Rptr. 670, 674 (1968). Chattem was guilty of this tort at the time Bailey relied on Chattem's misrepresentation to his detriment by assigning his patent rights to Chattem, an act he clearly performed in California. At that time he gave Chattem something of value in exchange for a promise which the jury found Chattem had no intention of keeping. Once Bailey relied to his detriment he was not required to wait to see whether Chattem ultimately chose to perform its promise notwithstanding its earlier fraudulent intent not to. Had Chattem chosen to perform that would have been in the nature of mitigation of Bailey's damages, but Chattem's non-performance was not a prerequisite to Bailey's recovery. Thus, the fact that Chattem refused to keep its promise in Tennessee does not dictate the application of Tennessee law. Because Bailey sustained a loss in California when he assigned his rights in the patent, the trial court properly applied the substantive law of California.[5]

■■■■ Chattem does not argue that under California law Bailey failed to prove a promissory fraud. Thus, we accept that fact as proven and turn to the question whether the damages awarded by the jury on this count were excessive. The jury found that as a result of Chattem's fraud

---

4. Chattem argues that this second assignment was merely a technical replacement of the first, with no greater effect. This argument, if made below, was rejected and we are bound to do the same.

5. The *lex loci delicti* rule is not followed in the Restatement (Second) of Conflict of Laws. In fact, Tennessee is one of only four states which still follow the rule. Some of the heavy criticism of the rule is directed at the fact that with torts such as fraud there may be no clearly demonstrable place of injury, or the loss could legitimately be said to be sustained in two or more states. Restatement (Second) of Conflict of Laws, Chapter 7, Introductory Note (1971).

In addition to this potential for confusion, the *lex loci delicti* rule lends itself to abuse. In a case such as the instant one a plaintiff could potentially choose the law to be applied to his fraud case simply by travelling to the state of his choice and parting with his patent rights there. Where the facts suggest such abuse we are not at all sure Tennessee would continue mechanically to apply the *lex loci delicti* rule. However, there is not even a hint of abuse here, so we do not hesitate to apply California law as we feel Tennessee would do.

We note that under the more modern approach of the Restatement (Second) California law would also apply. The Restatement (Second) applies the substantive law of the state with the greatest interest in the cause of action. As to fraud and misrepresentation, the Restatement identifies the following relevant contacts:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(a). Upon weighing these contacts on the facts before us we find that California law would still apply. *Id.*, Comment j.

Bailey suffered damage. Although the jury instructions are silent as to what the elements of Bailey's damages were for misrepresentation, the only damage supportable by the record is the assignment of his patent to Chattem. To make Bailey whole the jury would have to have found the value of the patent Bailey assigned. The jury arguments were not transcribed. However, in response to Chattem's post-verdict motions for judgment notwithstanding the verdict and for a new trial Bailey argued that the best measure of value is what Chattem offered him: a no-cut consulting agreement under which he would be paid $32,400 per year for the life of the patent, normally 17 years.[6] At the time of trial the maximum remaining length of the contract was 14 years. Because Bailey had been fully compensated under interim consulting agreements for the first three years of the life of the patent he was not entitled to damages attributable to that period. Chattem's evidence showed that the present worth of a contract for $32,400 per year for 14 years was $222,679.

However, the no-cut agreement was also to provide that Bailey would work for Chattem 108 days per year. Because Bailey was required to give Chattem something in addition to his rights in the patent, Chattem argued in its post-judgment motions that some portion of the $32,400 represented the value of Bailey's services, not consideration for the patent. The jury was required to determine how much of the $32,400 was a premium above the compensation for Bailey's services, designed as payment for the patent.[7] Chattem introduced evidence that based on Bailey's past consulting earnings at least $25,000 of the $32,400 was compensation for services, but there was also evidence from which the jury could find that the value of Bailey's services would decline before the patent expired.

Since a no-cut contract was to replace an automatically renewable two-year contract, terminable at the option of either party at the end of each two-year period, the increased job security of a no-cut contract was part of what Bailey was promised in exchange for the patent. Part of the jury's task was to measure the value of this job security in 1976, but neither party offered any evidence on this question. Finally, there was evidence that the parties discussed including a cost of living escalator in the contract which would "somehow" be tied to 1975 price levels. Although Bailey testified that the Department of Labor's cost of living index was mentioned, Bailey offered no proof either further defining the terms of the cost of living clause or estimating the future rate of inflation upon which the clause would operate.

The trial court's instructions on damages were wholly inadequate to guide the jury in the complicated task of weighing this evidence to find the amount by which Bailey was defrauded in 1976.[8] In essence, the

6. Bailey was also offered a one percent royalty on sales, but since he received this part of what he was promised the jury was not required to consider it here.

7. Chattem treats this question as one of Bailey's duty to mitigate his damages by finding alternate employment for 108 days per year, but in reality it has nothing to do with mitigation. It is simply a matter of deciding that part of the value Bailey was to receive under the employment contract was actually for the patent, not for his services. Since the jury found no breach of contract we are not concerned in this case with compensating Bailey for the value of the services he was to provide Chattem under the consulting agreement.

8. The following are the totality of the instructions on this item of damages:

> The Plaintiff would be entitled to recover all of the damages which he sustained as a direct and proximate result of the Defendant's misrepresentation. Now, in awarding damages for misrepresentation, compensation is to be given only for those losses which were caused by the misrepresentation and which could be reasonably foreseen as a probable result of the misrepresentation when it was made.
>
> Accordingly, one who is guilty of misrepresentation, while he may be held liable for all damages reasonably foreseeable which will be incurred by the Plaintiff by reason of such misrepresentation, one who is guilty of misrepresentation cannot be held liable for remote, contingent, and uncertain consequences or losses or for speculative or possible results which may have ensued from his

jury was only instructed that it should award Bailey all reasonably foreseeable damages that it could fix with reasonable certainty.[9] No attempt was made to particularize the instructions to his case. The jury was not instructed on the present worth of the contract, it was not told to apportion the $32,400 per year between the patent and Bailey's services, and it received no instruction at all on the cost of living clause. Left without guidance the jury apparently found the value of the patent in 1976, in addition to the one percent royalty, to be $548,000. The magistrate later reduced this figure to $400,000.

Chattem claims that the proof presented to the jury on compensatory damages was insufficient to sustain even this reduced verdict, and we agree. Because California law defined the tort here its law also controls on the measure of damages. Restatement (Second) of Conflict of Laws § 171. Under California law, when damages are measured by the value of a contract to be performed in the future the payments that were to be made under the contract must be reduced to present worth. *Daum v. Yuba Plaza, Inc.*, 11 Cal.App.3d 65, 89 Cal. Rptr. 458, 465 (1970). In this case, if the jury somehow found that the entire $32,400 per year was consideration for assignment of the patent its award could have been no higher than $222,679.

Bailey argues that the jury's award could legitimately be larger than this to take into account future inflation. However, here the measure of damages was set by a proposed contract, and the jury could not assume the payments under the contract would vary unless the contract so provided. Though there was a reference in the evidence to inclusion of a cost of living clause "somehow" tied to 1975 prices, without further definition this term is too vague for the jury to assign any non-arbitrary value to it. "To set a quantifiable damage figure arbitrarily is impermissible." *Agricultural Services Ass'n, Inc. v. Ferry-Morse Seed Co.*, 551 F.2d 1057, 1072 (6th Cir. 1977).[10] In denying Chattem's motion for new trial the magistrate further attempted to justify

conduct, though those results may be traceable to that cause.

Thus, the general rule is that one who is guilty of a misrepresentation is responsible for damages to the person to whom the misrepresentation was made, which damages are the natural and probable consequences of the misrepresentation. That is, that damages which are a direct and usual consequence of a misrepresentation are recoverable, irrespective of whether such damages are shown to have been in the contemplation of the parties at the time the misrepresentation was made.

However, losses of an unusual kind that do not directly and foreseeably flow from the misrepresentation can only be recovered where they are shown to have been within the contemplation of the parties at the time misrepresentation was made.

In proving damages for misrepresentation, the Plaintiff must prove by a preponderance of the evidence that the losses claimed by it were in fact sustained and that those losses were sustained as the probable and foreseeable result of the Defendant's misrepresentation.

In addition, before any element of damage may be allowed, the evidence must permit the jury to determine that damage with reasonable certainty.

Tr., Volume VII, pp. 932–933.

**9.** The blame for the sketchy instructions does not lie solely with the magistrate who tried the case. The parties were singularly unhelpful in providing the court with useful instructions on *any* aspect of the case.

Although much of the fault for the poor instructions rests with Chattem, this case is not appropriate for invocation of Fed.R.Civ.P. 51. Chattem has preserved the question whether the verdict was excessive, it did make some objection below, and the error is quite plain. Thus, Rule 51 does not bar our review. 5a Moore Federal Practice ¶ 5104 (2d ed. 1976).

**10.** If Bailey succeeds on remand in defining the cost of living clause sufficiently to go to the jury the parties will then face the issue they have argued here: what proof of inflation is necessary before the jury can take it into account. California law controls on the measure of damages, Restatement (Second) of Conflict of Laws, § 171, *supra*, and in California future inflation may be taken into consideration. *Vesey v. United States*, 626 F.2d 627, 631 (9th Cir. 1980). However, the law of the forum determines the sufficiency of the evidence, so the law of this Circuit dictates the nature of the evidence Bailey will be required to offer to withstand a motion for directed verdict on this issue. Restatement (Second) of Conflict of Laws § 135.

the jury's award by stating that it could include a component for lost future royalties. This justification is also foreclosed. Bailey already had a contract entitling him to royalties in the future and could not be damaged in that respect.[11]

Therefore, we can find no basis on which the damages awarded by the jury for promissory fraud (misrepresentation) can be justified. Because of that and because the instructions to the jury were so inadequate on this question we find it necessary to remand for a new trial on the question of compensatory damages only.[12]

### FAILURE TO COMMERCIALIZE

 Chattem's last argument on appeal is that the evidence was not sufficient to sustain the jury's verdict that Chattem breached an implied contractual duty to use its best efforts to commercialize Bailey's invention. In pertinent part the patent license agreement stated:

> Chattem at present contemplates marketing organo-aluminum compounds for use in the manufacture of unsaturated polyester resin compositions covered by the aforesaid patent application, and in the event Chattem establishes a market for such organo-aluminum compounds for use in such resin compositions, it agrees to pay Bailey one percent of the net sales price on all of Chattem's sales, for the period commencing January 21, 1976, of said organo-aluminum compounds for such resin compositions, covered by any patent to issue from the aforesaid application, Serial No. 651,814 it being expressly understood that no such payments shall accrue to Bailey for other sales of said organo-aluminum compounds.

It is Chattem's view that this contract language clearly and unambiguously states that Chattem has no *duty* to market Bailey's invention, but if it *chooses* to do so Bailey will receive a one percent royalty on all sales. Chattem contends that because the contract language is clear, the trial court erred in permitting the jury to imply a duty on Chattem's part to use its best efforts to develop the patent.

We quote from a leading treatise of the law of contracts:

> In any commercial agreement in which the compensation promised by one to the other is a percentage of profits or receipts, or is a royalty on goods sold, manufactured, or mined, there will nearly always be found an implied promise of diligent and careful performance in good faith and of forbearance to make performance impossible by going out of business or otherwise.

3 Corbin on Contracts § 568 (1960). This rule of law has been applied with full force to patent license agreements. *Bellows v. E. R. Squibb & Sons, Inc.,* 359 F.Supp. 204 (N.D.Ill.1973); 4 Walker on Patents § 407 (2d ed. 1965). Under Tennessee law contract terms may be implied in appropriate cases. *Hoskins v. United States,* 299 F.Supp. 1229, 1232 (E.D.Tenn.1969), aff'd, 425 F.2d 1301 (6th Cir. 1970). This was such a case, and it was not error to permit the jury to imply a duty of good faith performance on the part of Chattem.

There was evidence to support the jury's verdict. Bailey testified that the lack of commercial success was due to a "cobalt

---

11. The magistrate justified the verdict for promissory fraud as reduced by the remittitur in part on the basis that the jury's award for defendant's failure to commercialize the patent was only for the three years from the issuance of the patent to the end of Bailey's two-year contract in effect at the time of trial, so the jury could include future lost royalties in the compensatory damages. We are at a loss as to how he reached this conclusion. It is undisputed that there is a one percent royalty agreement. It is this agreement which forms the basis for the failure to commercialize claim. The jury was told to award damages to place Bailey in the position he would have been had the contract been performed, including the implied terms of using best efforts to commercialize the patent. Nowhere is it suggested that they were to award damages for only three years for Chattem's failure to use its best efforts.

12. As Chattem does not appeal the award of punitive damages, and it is clear that Bailey was entitled to at least *some* compensatory damages, we do not set aside this part of the verdict.

problem." He testified that for some time he was not consulted to work on this problem despite his expertise in the field and although Chattem was having no success in solving it otherwise. He also testified that Chattem seemed to lose interest in pursuing the commercial development of the invention once he filed this lawsuit. Finally, Bailey testified that once he began to work on the cobalt problem himself he was able to solve it in a fairly short time, which implied that Chattem could have done the same had it wished. Although there was also evidence that Chattem expended a great deal of money and effort trying to develop Bailey's invention, the jury was not required to accept this evidence as conclusive on the issue of Chattem's good faith in light of Bailey's contradictory evidence.

Nor can we find the jury's verdict on this count excessive. There was evidence of a large market for Bailey's invention which Chattem expected to reach with successful commercialization. Chattem's vice-president in charge of the chemical division told Bailey he hoped to realize sales of $4,000,000 per year, a figure that the jury could infer was not simply pulled out of the air but was the result of some market study. If realized, this sales goal would have entitled Bailey to $40,000 per year. Damages where there has been a failure to use reasonable efforts to commercialize are often not susceptible of certain proof, and courts, recognizing this, have required a lesser degree of certainty in such cases. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); *Stentor Electric Mfg. Co. v. Klaxon Co.*, 115 F.2d 268, 273–274 (3d Cir. 1940), *rev'd on other grounds*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). If the jury believed, as it was entitled to, that Bailey's patent could be made commercially successful, the $27,000 awarded on this count of Bailey's complaint is well within the realm of reason.

For the foregoing reasons the judgment of the District Court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.